**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**TERENCE TROY STEINER,**

      **Plaintiff,**

**v.**                                            **Case No.: 3:18-cv-00429**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 6, 7). The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be

**GRANTED**, the Commissioner's decision be **AFFIRMED,** and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On December 8, 2010, Plaintiff, Terence Troy Steiner ("Claimant"), completed an application for DIB, alleging a disability onset date of July 31, 2007 due to "bipolar, depression, anxiety, panic attacks, [and] sleep disorder." (Tr. at 124-25, 169). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 54-58, 64-66). Claimant filed a request for an administrative hearing, which was held on May 2, 2012 before the Honorable Charlie Paul Andrus, Administrative Law Judge ("ALJ Andrus"). (Tr. at 31-51). By written decision dated July 3, 2012, ALJ Andrus found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 14-30). The Appeals Council denied Claimant's request for review and Claimant filed a civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). The District Court concluded that ALJ Andrus's decision did not reflect full consideration of Claimant's mental and physical impairments and their functional effects. (Tr. at 1169-87). Therefore, the District Court reversed the Commissioner's final decision denying Claimant's DIB application and remanded the case to the agency for further administrative proceedings. (*Id.*).

On remand, the Appeals Council assigned Claimant's application to the Honorable Jerry Meade, Administrative Law Judge (the "ALJ"), and ordered the ALJ to offer Claimant the opportunity for another hearing, take any further action needed to complete the record, and issue a new decision. (Tr. at 992, 1167). On June 6, 2017, Claimant appeared for a hearing before the ALJ. (Tr. at 1114-40). By written decision dated November 17, 2017, the ALJ found that Claimant was not disabled as defined in

the Social Security Act. (Tr. at 989-1010). Claimant did not seek review from the Appeals Council. *See* (ECF No. 6 at 3). Instead, Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF Nos. 4, 5), and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 6, 7). Consequently, the issues are fully briefed and ready for resolution.

## II.     **Claimant's Background**

Claimant was 36 years old on his alleged onset date and 40 years old on his date last insured. He has a Bachelor of Arts degree in psychology with additional credits toward a Master's Degree in physiology, and he communicates in English. (Tr. at 168, 1120). Claimant previously worked as a restaurant host; activities coordinator/recreation aide in a nursing home; telemarketer; and a telemarketing supervisor. (Tr. at 46).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not,

then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed

by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 31, 2011. (Tr. at 995, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity from July 31, 2007, his alleged onset date, through his date last insured. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "osteoarthritis of

5

the left ankle; history of right tibial pillion fracture, status post open reduction internal fixation; bursitis of the left hip; history of L2 compression fracture; lumbar sprain; leg-length discrepancy; bipolar disorder; generalized anxiety disorder; panic disorder; and alcohol dependence." (*Id.,* Finding No. 3). The ALJ also considered Claimant's alleged sleep disorder but determined that it was not a medically determinable impairment. (Tr. at 995). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 995-97, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c). He can occasionally climb ladders, ropes, or scaffolds. He can occasionally stoop, kneel, crouch, and crawl. He can frequently balance and climb ramps/stairs. He must avoid concentrated exposure to vibrations and hazards such as moving machinery and unprotected heights. The claimant can understand, remember, and carry out simple instructions. He can have occasional changes in the work setting. He can have no interaction with the public. He can have occasional interaction with co-workers and supervisors.

 (Tr. at 997-1002, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform any of his past relevant work. (Tr. at 1002, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in other substantial gainful activity. (Tr. at 1001-02, Finding 7 through 10). The ALJ considered that (1) Claimant was born in 1970 and was defined as a younger individual age 18-49 on his date last insured; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 1002,

Finding 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including unskilled work as a store laborer, furniture cleaner, price marker, routing clerk, table worker, and sorter. (Tr. at 1003, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (*Id.*, Finding No. 11).

**IV.    Claimant's Challenge to the Commissioner's Decision**

Claimant contends that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to (1) conduct a proper subjective symptom analysis; (2) properly weigh the opinion of Claimant's treating psychiatrist, Rownak Afroz, M.D.; and (3) accept the vocational expert's testimony that a person cannot work if the person is off-task 20 percent or more of the workday. (ECF No. 6). In response to Claimant's arguments, the Commissioner contends that substantial evidence supports the ALJ's conclusions that Claimant's statements were not entirely consistent with the evidence and that Dr. Afroz's opinion was entitled to little weight. (ECF No. 7).

**V.    Relevant Evidence**

The undersigned has reviewed all evidence of record and summarizes the evidence that is most relevant to the issues in dispute below:

**A. Treatment Records**

A little over a year before his alleged onset of disability, Claimant was admitted to the psychiatric unit at Flagler Hospital in St. Augustine, Florida on May 23, 2006 after he presented to the emergency room reportedly feeling very depressed and suicidal. (Tr. at 260). The attending psychiatrist diagnosed Claimant with bipolar disorder without

psychotic features. (*Id.*). Claimant was prescribed lithium and "improved considerably" over the subsequent six to seven days. (*Id.*). On May 30, 2006, Claimant was discharged. He was noted to be alert, oriented, quite cooperative, and obviously very bright and talented. He exhibited no signs of delusions, mostly normal thoughts, and a good mood. (Tr. at 260-61). Claimant was instructed to continue taking lithium and to follow up with group activity and recreational therapy. (*Id.*).

On November 14, 2006, Claimant was again admitted to the psychiatric unit at Flagler Hospital after an argument with his partner, who called the police and reported that Claimant was suicidal. (Tr. at 249). Claimant initially presented to the emergency room screaming and yelling in a very intoxicated state with a blood alcohol content of 0.269. (*Id.*). It was suspected that he took an overdose of Inderal and Klonopin, but he stated that he had only taken three or four Klonopin tablets to "get some sleep." (*Id.*). Claimant denied being suicidal and stated that he was doing very well on lithium and staying quite stable. (*Id.*). However, he explained that he had trouble finding a job and wanted to move to Arizona to find work, which upset his partner and caused a fight. (*Id.*). Claimant denied regular use of alcohol or other drugs and stated that he had been sober since "last May." (*Id.*). Claimant was evaluated by the attending psychiatrist, Gregory Dent, M.D., who noted that Claimant's speech was clear after "sobering up;" his mood was euthymic; he had an appropriate and full range of affect, including humor; his thought processes were clear and coherent; he absolutely denied any suicidal intent or active suicidal thoughts; and his cognition was intact. (*Id.*). Dr. Dent's assessment was that Claimant suffered from alcohol intoxication with irrational behavior, which was resolved; bipolar disorder by history; and alcohol abuse. (Tr. at 250). Dr. Dent found that Claimant did not meet the criteria for an involuntary psychiatric admission, noting

that Claimant had plans for his future and intended to discontinue the relationship with his partner, which he believed would solve the stress and fighting. (*Id.*). Claimant planned to stay with his parents until he moved to Arizona. (*Id.*). Claimant was discharged the same day that he entered the hospital. (*Id.*).

On April 5, 2007, Claimant was admitted to the psychiatric unit at Flagler Hospital for a third time after his mother called authorities stating that Claimant, who had been drinking alcohol and taking Klonopin, threatened to overdose during an argument with her. (Tr. at 239). Claimant was evaluated the next morning by psychiatrist, Robert G. Baringer, M.D., who stated that Claimant had a normal mental status; seemed stable; was relevant, coherent, oriented, and clear; denied any suicidal ideation, intention, or impulse; had intact memory and good intelligence; and showed no evidence of any major mental illness. (*Id.*). Dr. Baringer found that Claimant did not meet the criteria for involuntary hospitalization and released Claimant to follow up with his outpatient providers. (*Id.*).

On July 23, 2007, Claimant saw Nicole Wilson, M.A., L.P.C., L.S.W., for individual therapy at Prestera Center. Claimant stated that he recently moved from Maine where he was living with friends. (Tr. at 435). He was currently homeless and living at the City Mission. (*Id.*). Claimant was working on securing government-assisted housing. (*Id.*). Rapport was easily established at the visit and a plan was developed regarding the issues to focus on in therapy. (*Id.*). Claimant expressed that he wished to work on his relationships. (*Id.*).

Claimant saw Ms. Wilson again on August 7, 2007. He was still living in the City Mission, but Claimant stated that he was "so excited" because his article was published in a newspaper in Florida. (Tr. at 436). During his next therapy appointment on August

Case 3:18-cv-00429    Document 8    Filed 01/14/19    Page 10 of 43 PageID #: 1538

27, 2007, Claimant told Ms. Wilson that he was "not feeling the same way about things," almost like he was "changing and becoming a different person." (Tr. at 437). At Claimant's subsequent visit with Ms. Wilson on September 11, 2007, Claimant advised that he had moved into his own apartment and that he was doing well. (Tr. at 438). Claimant stated that his "usual triggers" did not cause him any "bipolar episodes." (*Id.*). He felt much more in control of his life and even "tried to start a few of his old triggers to see what would happen and nothing did." (*Id.*). On October 5, 2007, Claimant had "no real problems to report" to Ms. Wilson. (Tr. at 439). He continued to feel much better and had no major "bipolar incidents." (*Id.*). On November 28, 2007, Claimant told Ms. Wilson that he believed that lithium was kicking in and he felt better. (Tr. at 440). He was angry that his previous provider allowed him to run out of medications and was writing a grievance to report the issue. (*Id.*). On December 5, 2007, Claimant told Ms. Wilson that he believed that his ex-partner was stalking him and he was afraid. (Tr. at 441). Thus, he was considering "leaving the area." (*Id.*).

However, Claimant saw psychiatrist, Nika Razavipour, M.D., two days later on December 7, 2007. (Tr. at 461). Claimant reported feeling "fine." (*Id.*). His diagnoses were bipolar disorder; alcohol dependence; and anxiety disorder, not otherwise specified. (*Id.*). Dr. Razavipour renewed Claimant's prescriptions for lithium, clonidine, and lisinopril. (*Id.*). He discontinued Claimant's prescription for trazodone due to lack of efficacy and started Claimant on a trial of Seroquel. (*Id.*).

Claimant saw Dr. Razavipour again on January 11, 2008. (Tr. at 463). Claimant was doing very well on lithium and denied having any complaints or mood problems. (*Id.*). Claimant felt that he was stable enough to start working again, possibly as a substitute teacher. (*Id.*). Dr. Razavipour renewed Claimant's prescriptions for lithium

and Seroquel. (*Id.*). On February 4, 2008, Claimant told Ms. Wilson that things seemed to be "looking up;" his bipolar disorder seemed to be under control; he was stable on medications; and he was excited about a potential new relationship. (Tr. at 442). Claimant followed up with Dr. Razavipour for medication management on March 7, 2008. (Tr. at 598-99). Claimant stated that he felt great. (Tr. at 598). Claimant's attitude was cooperative; his affect was euthymic with a full range of expressions; his speech was clear and coherent; his thought processes were goal directed; his memory and concentration were intact; and his insight and judgment were good. (*Id.*). Claimant was continued on lithium and Seroquel and scheduled to return to Dr. Razavipour in three months. (Tr. at 599). On March 31, 2008, Claimant told Ms. Wilson that his bipolar disorder seemed to be under control, and he was doing well on lithium. (Tr. at 444). He was possibly moving to Ashland, Kentucky to live with his significant other. (*Id.*). On May 1, 2008, Claimant told Ms. Wilson that he felt like "things were falling into place" and that he was "feeling better and making progress in [his] life." (Tr. at 445). He stated that he was happy and excited about "the way that [his life] was going." (*Id.*). He was politically active and was helping a friend with his greenhouse and enjoyed the work. (*Id.*). Ms. Wilson assessed that Claimant was probably ready for discharge from therapy. (*Id.*).

On June 6, 2008, Claimant had his final session with Ms. Wilson. (Tr. at 432, 447). Claimant stated that "things fell through" with his new love interest, but that he was "ok with it." (*Id.*). He denied any manic episodes or thoughts or any impulsive behaviors. (Tr. at 447). Claimant continued to enjoy working in the greenhouse, and his mental status was within normal limits. (*Id.*). Claimant was moving to Florida, but Ms. Wilson noted that Claimant successfully completed therapy before leaving. (Tr. at 432).

Claimant also saw Dr. Razavipour on June 6, 2008. (Tr. at 462). Claimant was feeling fine, was stable, and was sleeping well, sometimes even without taking Seroquel. (*Id.*). Consistent with what Claimant told Ms. Wilson, he stated that he was working in a greenhouse and planning to move to Florida to find work. (*Id.*). Claimant was no longer taking clonidine or lisinopril. (*Id.*). Dr. Razavipour renewed Claimant's prescriptions for lithium and Seroquel. (*Id.*). Claimant followed up with Dr. Razavipour again on August 10, 2008. He was continued on lithium and started on trazodone. (Tr. at 597).

On November 2, 2008, Claimant was voluntarily admitted to the psychiatric unit at St. Mary's Medical Center in Huntington, West Virginia after he presented to the emergency room with suicidal ideation. (Tr. at 288). Claimant was evaluated by psychiatrist, Kenneth M. Fink, M.D. (*Id.*). Claimant stated that "things went downhill" since he stopped taking his prescribed medications, including lithium, two weeks earlier when he became unable to pay for his prescriptions. He admitted to self-medicating with alcohol. (*Id.*). Claimant related that he had been living in St. Augustine, Florida, but returned to Huntington two or three weeks ago. (Tr. at 289). In terms of his history, he stated that he had gone through 14 jobs in the past two or three years. (*Id.*). He reported being a "child prodigy" who graduated from the North Carolina School of Arts, worked for a Belgian dance company, earned a Bachelor of Arts degree in psychology from Marshall University, and earned credits toward a master's degree that was not conferred because he had some disagreement and "walked out." (*Id.*). On examination, Claimant was oriented in all spheres, but his mood was depressed, and his affect was flat. (Tr. at 290). He did not exhibit signs of psychosis or delusions; his memory and judgment were intact; his eye contact was marginal-to-fair; and he was cooperative. (Tr. at 291). Claimant remained in the hospital for over a week and received individual and group

therapy, as well as medication adjustments. (Tr. at 382). Dr. Fink evaluated Claimant again on November 10, 2008. (*Id.*). Claimant was alert and oriented and his mood was improved. (*Id.*). He was discharged in stable condition with discharge diagnoses of mood disorder, not otherwise specified; provisional bipolar disorder, not otherwise specified; anxiety disorder, not otherwise specified; episodic alcohol dependence; nicotine dependence; and remote cocaine abuse that was in remission. (Tr. at 383).

Claimant followed up with Ms. Wilson the day after his discharge from St. Mary's Medical Center. (Tr. at 450). Claimant stated that he was glad that he went to the hospital and that his medications were stabilizing again. (*Id.*). He explained that he ended up in the hospital after he went on a "drinking binge" because his lithium had been out of balance, which rendered him manic for quite some time. (*Id.*).

The next month, Claimant saw Dr. Razavipour on December 4, 2008. Dr. Razavipour took note of the fact that Claimant had been in Florida off of his medications, became very manic, was drinking excessively, and then became suicidal. (Tr. at 464). Dr. Razavipour's diagnoses of Claimant remained bipolar disorder; alcohol dependence; and anxiety disorder, not otherwise specified. (*Id.*). Dr. Razavipour prescribed Tegretol, Seroquel, and propranolol. (*Id.*). Dr. Razavipour reevaluated Claimant on December 18, 2008. (Tr. at 465). Claimant reported doing "very well." (*Id.*). He felt stable on his current medications and stated that his book was about to be published. (*Id.*).

On March 4, 2009, Claimant began seeing a new therapist, MaryBeth Smith, M.A., because Ms. Wilson was no longer working at Prestera Center. (Tr. at 452). Claimant stated that the previous six weeks were difficult, as his friend had jumped out of a moving vehicle and died, and Claimant also had familial and financial struggles. (*Id.*). However, Claimant stated that he was able to identify "triggers" for his symptoms

and thus make "the relapse time not as long." (*Id.*). He was able to provide his mental health history in great detail and was oriented in all spheres. (*Id.*). Claimant followed up with Dr. Razavipour on March 12, 2009. (Tr. at 466). He reiterated that he was having trouble with depression. (*Id.*). Dr. Razavipour increased Claimant's dosage of Tegretol and continued Claimant on Seroquel and propranolol. (*Id.*). Later that month, on March 25, 2009, Claimant told Ms. Smith that he recognized a "cycling" pattern in terms of his bipolar disorder. (Tr. at 454). He was working 16 to 18 hours per day without becoming tired and was acting impulsively by drinking and spending money. (*Id.*). Claimant felt that it was the worst cycle since 2006, but it did not last as long or culminate in hospitalization. (*Id.*). He stated that he subsequently found out from his psychiatrist that the symptoms were caused by his low Tegretol levels. (*Id.*). Claimant was frustrated that the blood work was performed in January and he was just now given the results. (*Id.*).

Claimant saw Dr. Razavipour on April 9, 2009. He stated that he felt good and that his mood was stable since his dosage of Tegretol was increased. (Tr. at 600). His attitude was cooperative; he was oriented in all spheres; his affect was euthymic; his speech was clear and coherent; and his concentration, insight, and judgment were intact. (*Id.*). His prescriptions for Tegretol, proponolol, and Seroquel were renewed. (Tr. at 601).

On June 7, 2009, Claimant told Ms. Smith that he no longer needed therapy. (Tr. at 456). He expressed that his symptoms were under control and he was doing well. (*Id.*). He felt "great" and noted that his book was published and he was planning to promote it. (*Id.*). Claimant stated that he knew his limitations and confirmed that he would seek therapy if he needed it again. (*Id.*). On June 8, 2009, Claimant had his last therapy session at Prestera Center. (Tr. at 433). It was noted that Claimant had made progress

and recognized his triggers and coping strategies. (*Id.*). He would continue receiving medication management from Dr. Razavipour. (Tr. at 433-34). Claimant expressed similar sentiments to Dr. Razavipour during his appointment on June 12, 2009. (Tr. at 467). Claimant stated that he felt fine, was very excited about the book that he published, and he denied any mood swings. (*Id.*). Dr. Razavipour renewed Claimant's prescriptions for Tegretol and propranolol. (*Id.*).

On July 27, 2009, Claimant reported to Dr. Razavipour that he had an episode of mania and irritability and then lots of depression, but he now felt fine. (Tr. at 468). He was continued on medications. (*Id.*). Claimant resumed mental health counseling on August 21, 2009. Claimant saw Jennifer Floyd, M.A., at Prestera Center, stating that he wanted to get back in therapy to help him sort out what was going on and where he needed "to go with his life over the next six months." (Tr. at 457). Claimant felt that he was cycling more rapidly since his medication was switched to Tegretol. (*Id.*). He was having the most trouble with depression because he could not predict what triggered it and when it was coming, whereas he used to feel more in control. (*Id.*). Claimant stated that he "used up" everything that Huntington, West Virginia had to offer him, but that another one of his books was going to be published the next month and he planned to travel to Europe in February 2010. (*Id.*). Claimant's mood and affect were euthymic, and he was very verbal with a dramatic presentation. (*Id.*). Claimant did not have any suicidal or homicidal ideation. (*Id.*).

The next month, on September 25, 2009, Claimant expressed concerns to Dr. Razavipour regarding episodes of depression. (Tr. at 469). Dr. Razavipour planned to check Claimant's Tegretol level in his blood and increased Claimant's dosage of Tegretol and prescribed Celexa. (*Id.*). On September 28, 2009, Claimant told Ms. Floyd that he

was feeling much more secure and in control since his previous visit. (Tr. at 459). He noted that Dr. Razavipour added Celexa to his medication regimen and increased his Tegretol, which Claimant felt was an "insurance policy" against him sliding into a "bad depression." (*Id.*). Claimant still planned to go to Europe in February. (*Id.*). He felt that he no longer needed therapy and would follow up with Dr. Razavipour. (*Id.*). Claimant's mood and affect were euthymic, and he had no suicidal ideation. (*Id.*).

On October 23, 2009, Claimant told Dr. Razavipour that he was feeling better. (Tr. at 470). His Tegretol level was within normal limits. (*Id.*). Claimant was excited about traveling to promote his book. (*Id.*). He was continued on medications. (*Id.*). Claimant saw Dr. Razavipour again on October 31, 2009, which was earlier than normal, because he planned to travel to North Carolina for business purposes and came in for an appointment before he left. (Tr. at 471). Claimant still planned to travel to Europe in February to promote his book and he felt excited. (*Id.*).

On March 20, 2010, Claimant followed up with Dr. Razavipour, noting that he felt good and was very stable in the past four months. (Tr. at 602). He had been traveling and promoting his book. (*Id.*). He was leaving to travel to Europe to play music and continue to promote his book. (*Id.*). His mental status examination did not reveal any issues. (*Id.*).

On October 23, 2010, Claimant presented to the emergency room at Queens Hospital Center in Jamaica, New York after he took approximately ten tablets of Celexa and 24 tablets of Tegretol in an apparent suicide attempt. (Tr. at 666). Claimant was evaluated by the psychiatric unit, who recommended inpatient psychiatric treatment. (*Id.*). Thus, Claimant was transferred to the hospital's inpatient psychiatric unit on October 27, 2010. (Tr. at 665). Claimant related that he  had been stable on Tegretol for

his manic episodes, but he did not feel that Celexa was effective for his bipolar disorder. (Tr. at 662). He stated that he overdosed on his medications impulsively in reaction to emotional stressors, including his relationship with his partner, the fact that he was recently "beaten up" by his partner's friend, and family issues. (*Id.*). Claimant was prescribed Tegretol in the hospital because he stated that it worked well for him and he wished to continue taking it. He was additionally prescribed Lexapro and Atarax. (*Id.*). Claimant responded well to the medications and was discharged on November 3, 2010. (Tr. at 661-62). At that time, his mood was euthymic with congruent affect, he adamantly denied suicidal ideation, and he planned to pursue an order of protection against his partner's friend. (Tr. at 662). Claimant also reported that he was employed as a teacher in Harlem. (*Id.*).

On November 12, 2010, Claimant was once again admitted for inpatient mental health treatment at Queens Hospital Center after he presented with a depressed mood and suicidal ideation. (Tr. at 657-58). Claimant related that he was in an abusive relationship and planned to move back home to live with his family. (Tr. at 658). Claimant was compliant with treatment in the hospital and participated in the sessions offered. (Tr. (*Id.*). Therefore, he was discharged on November 24, 2010. (Tr. at 657). The attending psychiatrist, Shaheen Rahman, M.D., diagnosed Claimant with severe bipolar affective disorder without mention of psychotic behavior. (Tr. at 659). At the time of his discharge, Claimant's attention/concentration was adequate; his speech was normal; his affect was congruent; his mood was euthymic; his thought content and perception were normal; his thought processes were logical and goal-directed; he was oriented in all spheres; he denied having suicidal ideation; and his insight/judgment and impulse control were fair. (*Id.*).

On December 6, 2010, Claimant saw Ms. Floyd to reestablish psychiatric services and therapy. (Tr. at 610). Claimant related that, in the past six months, he was involved in an abusive relationship while living in the New York City area. (*Id.*). He became so depressed that he took an overdose of Tegretol and ended up in the hospital. (*Id.*). He ended the relationship and was living back in Huntington, West Virginia. (*Id.*). His depression was improving, but he had anxiety and ruminating thoughts. (*Id.*).

On December 11, 2010, Claimant began seeing a new psychiatrist, Dr. Afroz. On examination, Claimant was cooperative; his thought processes were goal directed; his mood was good; his affect was euthymic; his memory was within normal limits; and his concentration was fair.  (Tr. at 604-05). Dr. Afroz diagnosed Claimant with bipolar affective disorder. (Tr. at 605). He continued Claimant on Tegretol, adjusted the dosage of Seroquel, and restarted Claimant on Paxil. (*Id.*). Claimant saw Ms. Floyd again on December 22, 2010. He stated that he was back on a stable medication regimen and was spending time with his grandmother, which brightened his mood. (Tr. at 612).

Yet, on February 16, 2011, Claimant presented to the emergency room at St. Mary's Medical Center, complaining of increasing depression and thoughts of suicide. (Tr. at 795). He was noted to be intoxicated and admitted to drinking a bottle of cooking sherry to try to poison himself. (*Id.*). Claimant stated that he had suffered from anxiety since he was assaulted by a male houseguest earlier that month. (*Id.*). Also, Claimant reported that eight of his immediate family members had died, his father was currently ill, and he was stressed about turning 40. (Tr. at 795, 809). Claimant noted that he lived across the street from St. Mary's Medical Center and walked to the emergency room. (Tr. at 809). Claimant was voluntarily admitted for in-patient psychiatric treatment under the care of Dr. Fink. (Tr. at 796). He was given medications and participated in group

18

and individual therapy. (Tr. at 797). Claimant was discharged on February 24, 2011 to follow up with his therapist and psychiatrist. (Tr. at 798).

On March 10, 2011, Claimant saw Ms. Floyd. He reported that his mood was fairly stable. (Tr. at 830). He explained that, during the prior month, he began drinking "some" again after a bad visit with an old friend and he "hit another dip in his depression" and checked himself into the hospital. (*Id.*). Two days later, Claimant saw Dr. Afroz for medication management. (Tr. at 831). Claimant stated that he was doing better now and that his sleep was good and his mood was stable. He was not having any panic attacks or suicidal ideation. (*Id.*). His Tegretol level was low prior to his hospital admission, but it was now at a therapeutic level, and his mental status examination was within normal limits. (Tr. at 831-32). Dr. Afroz diagnosed Claimant with severe bipolar disorder without psychotic features. (Tr. at 833). He noted that Claimant had only mild psychosocial/environmental problems. (*Id.*). Dr. Afroz continued Claimant on Tegretol, Seroquel, and Paxil. (*Id.*). Vistaril was discontinued. (*Id.*).

Claimant saw Dr. Afroz again on June 4, 2011, which was after Claimant's date last insured on March 31, 2011. (Tr. at 835). Claimant was "doing good" and his mood was stable. (*Id.*). His mental status examination was again within normal limits. (Tr. at 835-36). Claimant was continued on medications. (Tr. at 837).

### B. Evaluations and Opinions

On March 4, 2009, Claimant underwent a consultative psychological evaluation performed by psychologist, Lisa C. Tate, M.A., for the West Virginia Disability Determination Service. Claimant's grooming and personal hygiene were good; he walked with a normal gait; he maintained a normal posture; and he appeared to have good use of his limbs. (Tr. at 352). Claimant reported that he had problems with

19

depression since 1986 or 1987. (Tr. at 353). He described that he remained symptom-free for three to four months at a time and would then "crash," experiencing three to four depressive episodes per year. (*Id.*). His most recent depressive episode was approximately one month earlier, and it lasted for two weeks. (*Id.*). On examination, Claimant was alert and oriented; his mood was euthymic; his affect was broad and reactive; his thought processes appeared logical and coherent; there was no indication of disturbances in thought content; his insight was fair; and his judgment, memory, concentration, and psychomotor behavior were within normal limits. (Tr. at 355). Claimant denied having any suicidal or homicidal ideation. (*Id.*). Ms. Tate assessed that Claimant suffered from bipolar disorder, not otherwise specified; panic disorder with agoraphobia; and alcohol dependence. (Tr. at 356). His typical daily routine consisted of taking a shower, making meals, writing, and cleaning his home. (*Id.*). He spent fifty to sixty percent of his time at home, but also went to the Marshall University Library/Study Center four to five times per week, sometimes for as long as 16 hours at a time; visited his grandmother twice per week; and went to the movies every three months. (*Id.*). Claimant related that he had a book coming out in Germany later in the month and had published four articles in the past year for non-profit organizations. (*Id.*). He stated that his daily activities varied based on whether he was in a manic or depressed state. (*Id.*). His hobbies included writing, reading, photography, and writing music. (*Id.*). He would sometimes go months without reading and then read several books back-to-back. (*Id.*). He was currently working on a multimedia project most days. (*Id.*). Ms. Tate assessed that Claimant's social functioning, concentration, persistence, and pace were all within normal limits. (Tr. at 357).

On February 3, 2011, Timothy Saar, Ph.D., completed a psychiatric review technique based upon his review of Claimant's records. (Tr. at 694). Dr. Saar concluded that Claimant's mental impairments, including bipolar disorder and panic/anxiety, were not severe. (Tr. at 682, 685, 687). Dr. Saar assessed that Claimant had no restriction in activities of daily living or episodes of decompensation of extended duration, and he had only mild difficulties maintaining social functioning and concentration, persistence, or pace. (Tr. at 692). Dr. Saar found Claimant's allegations to be credible, as they appeared to concur with the medical evidence of record. (Tr. at 694). Dr. Saar noted that the discharge summaries from Claimant's psychiatric hospitalizations and Claimant's most recent mental status evaluation from Prestera Center showed mild-to-no limitations. (*Id.*). Jeff Harlow, Ph.D., affirmed Dr. Saar's psychiatric review technique on July 2, 2011. (Tr. at 858).

On March 16, 2011, Claimant underwent an internal medical examination performed by Kip Beard, M.D. Claimant related that he "fell two stories in the late 1990s" and fractured his low back and right ankle. (Tr. at 768).  He underwent surgery and some physical therapy, but stated that he continued to have pain in his low back, knee, ankle, and, most significantly, in his left hip. (*Id.*). Claimant stated that he had constant piercing pain that could run down his left leg. (*Id.*). He expressed that he could "barely walk." (*Id.*). He expressed that he had trouble pursuing any physical evaluations or treatment because he did not have health insurance. (Tr. at 768-69). Claimant presented without ambulatory aids. (Tr. at 770). His gait was mildly limping on the left, but it was not unsteady or unpredictable. (*Id.*). He could stand unassisted and he could arise from his seat and step down from the examination table without difficulty. (*Id.*). He seemed comfortable while seated and only mildly uncomfortable while supine. (*Id.*). Claimant

could heel-walk, toe-walk, tandem walk, and squat without pain. (Tr. at 772). On examination, Claimant had some decreased lumbar lordosis and some mild pain in his left ankle, knee, and hip. (Tr. at 771, 772). However, Claimant's range of motion was preserved and he had a negative straight leg raising test and no clinical signs of radiculopathy. (Tr. at 772). Claimant's left leg appeared to be approximately one centimeter shorter than his right leg and internal rotation increased his hip pain, which was possibly suggestive of osteoarthritis in Claimant's left hip. (*Id.*). He showed no evidence of weakness, his sensation was intact, and his reflexes were normal. (Tr. at 771, 772).

On March 21, 2011, Uma Reddy, M.D., assessed Claimant's physical RFC based upon a review of Claimant's records. Dr. Reddy concluded that Claimant could perform work at the medium exertional level that did not require more than occasional climbing of ladders, ropes, or scaffolds; stooping; kneeling; crouching; or crawling and no concentrated exposure to vibration or hazards. (Tr. at 774, 775, 777). Dr. Reddy found Claimant to be minimally credible regarding his physical complaints, noting that the medical evidence did not indicate any disabling physical limitations, Claimant was not prescribed any pain medications, and Claimant's activities of daily living were only limited by his mental issues. (Tr. at 778). Marcel Lambrechts, M.D., affirmed the RFC on June 28, 2011. (Tr. at 857).

On March 25, 2011, psychiatrist H. Hoback Clark, M.D., performed a case analysis based upon her review of Claimant's records. Dr. Clark stated that Dr. Saar neglected to assess Claimant's one-to-two episodes of decompensation in the past year. (Tr. at 781). Also, Dr. Clark noted that the record showed moderate interruption in Claimant's pace from psychologically-based symptoms. (*Id.*). Nevertheless, Dr. Clark

22

found that Claimant did not have any severe mental impairments. (*Id.*). Dr. Clark remarked that Claimant's psychiatrist described Claimant as cooperative with normal memory and fair concentration. (*Id.*).

On May 5, 2012, Dr. Afroz completed a Mental Status Statement of Ability to Do Work-Related Activities form. Dr. Afroz stated that Claimant's diagnoses included type I bipolar disorder and severe psychological problems for which Claimant was prescribed Tegretol, Paxil, and propranolol. (Tr. at 985). He rated Claimant's mental impairments and symptoms as moderate to severe. (*Id.*). However, Dr. Afroz stated that he was guardedly optimistic about Claimant's prognosis. (*Id.*). Dr. Afroz opined that Claimant had only mild limitations in carrying out complex instructions, making judgments on complex work-related decisions, interacting appropriately with the public, and responding appropriately to usual work situations and changes. (Tr. at 986). Dr. Afroz assessed that Claimant had no other limitations in work-related activities. (*Id.*). Nonetheless, Dr. Afroz concluded that Claimant's impairments or treatment would cause him to be absent from work five or more days per month. (Tr. at 987). He explained that Claimant's panic attacks and inability to deal with crowds or too many people would make it difficult for him to work at a regular job on a sustained basis. (Tr. at 988).

### C. Claimant's Statements

Claimant testified at his administrative hearing on May 2, 2012 that he had an undergraduate degree in psychology and had completed all of the courses for a Master's Degree with a 4.0 average, but that there was "a contention" over his thesis, and he did not obtain the degree. (Tr. at 36). He explained that he became disabled on July 31, 2007 when his grandfather died, his cat died, and his four-year relationship dissolved. (Tr. at

37). He stated that he "got sick" and checked himself into the hospital. (*Id.*). He testified that he attempted to work for Amazon in 2008 for less than three weeks, but he "ended up manic" and in his bed for nine days and then checked himself into a crisis center. (*Id.*). Claimant listed his impairments as bipolar disorder, previous broken back and ankle, and degenerative arthritis in his left hip. (*Id.*). He stated that his medications kept his bipolar disorder within "a degree of manageability," but that he still ended up in bed 30 to 45 days out of the year. (Tr. at 39). Claimant testified that he did not have any sitting limitations and walked one mile in the mornings, but that he was "on [his] back for two days" if he tried to walk more than one mile. He also avoided lifting anything due to his back problems. (*Id.*). In terms of bipolar disorder, Claimant stated that he had no memory limitations, but he no longer socialized with anyone except for his grandmother. (Tr. at 40). He testified that he was also very impulsive and provided the example that he once abandoned his car by the side of the road in Florida. (Tr. at 40-41). His typical daily activities included reading, writing, taking pictures, walking for 30 minutes, visiting his grandmother twice per week, and watching foreign films. (Tr. at 41). Claimant explained that bipolar episodes historically occurred four times per year in mid-February, May, August, and on his birthday, November 12. (*Id.*). He stated that his episodes "used to be manic," but he now took Tegretol, which managed the mania, although his depression was worse. (Tr. at 42). According to Claimant, the bipolar episodes lasted almost two weeks. (*Id.*). Claimant stated that he saw his therapist every two weeks and his psychiatrist every three months. (Tr. at 430).

Following remand, Claimant testified at another administrative hearing held on June 6, 2017. Claimant explained that he lived in Huntington, West Virginia, but he traveled to Florida on occasion. (Tr. at 1119). Claimant's father was now deceased, but

24

his mother and sister lived in Florida. (Tr. at 1120). Claimant reiterated that he had a Bachelor of Arts degree in psychology, but "walked away" from his master's program in physiology. (*Id.*). Claimant stated that he was also previously a professional dancer "on and off" for almost 16 years in New York City, Belgium, and France. (Tr. at 1121). However, he stopped dancing when he injured his back. (Tr. at 1121). Claimant explained that he fell from a climbing wall in 1998 and fractured his lumbar spine and right ankle. He also fell out of a window in 2013 and again fractured his lumbar spine and left calcaneus. (Tr. at 1122). Claimant was currently taking two online courses in religious studies. (Tr. at 1121). He continued to take Tegretol, propranolol, and Paxil. (Tr. at 1125). In terms of physical limitations, Claimant stated that it was difficult for him to stand or sit for extended periods. (Tr. at 1127). He could still walk one mile "on a good day." (Tr. at 1128). He stated that he could lift up to ten pounds, but that he could not do so repetitively. (*Id.*). Claimant testified that he saw his family, but almost never went out socially. (Tr. at 1130).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de

novo review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

**VII.   Discussion**

Claimant challenges the ALJ's analysis of (1) his subjective symptoms, (2) the May 2012 opinion of his treating psychiatrist, and (3) the testimony of the vocational experts. Each argument is considered below, in turn.

### A. Subjective Symptom Analysis

Claimant contends that the ALJ failed to properly evaluate his reported symptoms. (ECF No. 6 at 5). He specifically argues that the ALJ's conclusion that his statements were "not entirely consistent with the medical evidence," "flies in the face" of the May 11, 2012 opinion of his treating psychiatrist, Dr. Afroz, which explained that Claimant suffered from extreme bipolar syndrome with a history of manic and depressive syndromes causing Claimant to be absent from work five days per month. (*Id.* at 5-6). Claimant contends that although the ALJ recited several observations about his activity level, the ALJ failed to articulate how the evidence undermined Claimant's credibility in light of the objective medical evidence and Dr. Afroz's opinion. (*Id.* at 7).

Pursuant to 20 C.F.R. § 404.1529, the ALJ evaluates a claimant's report of symptoms using a two-step method. First, the ALJ must determine whether the claimant's medically determinable physical and psychological conditions could

reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R. § 404.1529(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *Id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location,

duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) A longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

> In *Hines v. Barnhart*, the Fourth Circuit stated that:
>
> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been

considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ clearly performed the two-step process. The ALJ noted Claimant's pain complaints related to his previous back and ankle fractures. (Tr. at 998). The ALJ also recited Claimant's complaints related to bipolar disorder, anxiety, and post-traumatic stress disorder. (*Id.*). Ultimately, after considering the subjective and objective evidence, the ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Tr. at 999). However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely consistent with the medical evidence and other evidence in the record" for several reasons. (*Id.*). The ALJ first discussed that Claimant's allegations were inconsistent with the medical evidence. (*Id.*). The ALJ noted that Claimant did not receive any treatment during the relevant period for orthopedic issues, although he did report pain in his left ankle, left hip, and low back during his consultative examination. (*Id.*). Moreover, the ALJ cited that Claimant's physical examination on March 16, 2011 was objectively normal other than decreased lumbar lordosis and a centimeter-length leg discrepancy. (Tr. at 999). In terms of Claimant's mental impairments, the ALJ remarked that Claimant's mental status examinations were grossly normal overall. (*Id.*). The ALJ considered Claimant's multiple psychiatric hospitalizations but noted that they were precipitated and aggravated by medication noncompliance and alcohol abuse. (*Id.*). Further, the ALJ considered that Claimant's symptoms resolved with proper medication and sobriety and his mental status examinations were normal upon discharge. (*Id.*). The ALJ remarked that Claimant stated to his therapist in December 2010 that medication and therapy helped him "a lot." (*Id.*).

The ALJ also considered Claimant's "wide variety of daily activities during the relevant period," including maintaining his personal hygiene; preparing meals; cleaning his home; going to movies; reading; writing; taking photographs; writing music; working at a friend's greenhouse; engaging in political activism; publishing poems, four articles, and three books; and traveling to Europe. (*Id.*). Furthermore, the ALJ noted the opinions of the state agency physicians, which were rendered very close in time to Claimant's date last insured, that concluded that Claimant could perform a range of medium work. (*Id.*). The ALJ gave such opinions great weight upon finding that they were consistent with the record as a whole. (*Id.*). However, the ALJ gave little weight to the state agency psychologists' opinions that Claimant did not have any severe mental impairments and only mild functional limitations. (Tr. at 1000). The ALJ found that the record substantiated that Claimant suffered from severe mental impairments that limited his RFC and the ALJ stated that he accounted for such limitations in the RFC finding. (*Id.*). The ALJ noted that he agreed with the psychological consultative examiner's opinion that Claimant suffered from moderate interruptions in pace, but also found that Claimant had moderate limitations interacting with others based upon the evidence. (*Id.*). Finally, the ALJ considered Dr. Afroz's May 2012 opinion that Claimant had marked and extreme mental symptoms and that Claimant would be absent from work five or more days per month. (Tr. at 1000). The ALJ found that Dr. Afroz's opinion was not well-supported by medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with the other substantial evidence in the record. (*Id.*). As explained in more detail below, the ALJ performed a thorough and detailed review of Dr. Afroz's opinion, but certainly found it unpersuasive as to the status of Claimant's condition on the date last insured in large part because Dr. Afroz's clinical notes

prepared closest in time to that date reflect that Claimant was "doing better," coping well, sleeping well, and was acting and feeling entirely within normal limits. (Tr. at 1001).

As shown above, the ALJ articulated substantial support for his conclusions that Claimant's allegations were not entirely consistent with the medical evidence and the other evidence in the record. The record substantiates that although Claimant suffered from some physical and mental limitations, which were managed by medication and therapy, he maintained normal mental status and mood stability when sober and medically compliant. (Tr. at 239). For instance, psychiatrist Dr. Baringer stated in April 2007, the month after Claimant's alleged onset of disability, that Claimant showed no evidence of any major mental illness and had a normal mental status. (*Id.*). Claimant told his therapist later that year in September 2007 that his usual triggers no longer caused him bipolar episodes. (Tr. at 438). Claimant told his psychiatrist Dr. Razavipour in January 2008 that he felt well enough to start working again, possibly as a substitute teacher. (Tr. at 463). Claimant told his therapist in February 2008 that things seemed to be "looking up" and Claimant told Dr. Razavipour in March 2008 that he felt "great." (Tr. at 442, 598). Claimant's mental status was normal. (Tr. at 598). Claimant continued to do well and expressed excitement about his life until November 2008. (Tr. at 432, 444, 447, 462). In November 2008, Claimant presented to the hospital with suicidal ideation, stating that "things went downhill" since he stopped taking his prescribed medications two weeks earlier. (Tr. at 288). He stated that he was also abusing alcohol. (*Id.*). When Claimant was restarted on medications and provided therapy, he rapidly improved and was discharged from the hospital in stable condition. (Tr. at 382-83). Claimant told his therapist on November 11, 2008, the day after his discharge, that he

32

was glad that he went to the hospital and that his medications were stabilizing again. (Tr. at 450). He explained to his therapist and to Dr. Razavipour the following month that he ended up in the hospital because he was off of his medications and on a drinking binge. (Tr. at 450, 464). Claimant told Dr. Razavipour in December 2008 that he was doing "very well," was again stable on medications, and that his book was about to be published. (Tr. at 465). In March 2009, Claimant explained that he suffered some difficult personal circumstances, including a friend's suicide, but that he was learning to cope with his bipolar disorder and identify his triggers. (Tr. at 452, 454). Claimant's Tegretol level was low, but, once it was increased, Claimant stated that his mood was again stable and his mental status was normal. (Tr. at 454, 600). Indeed, Claimant felt so "great" that he discontinued therapy in June 2009. (Tr. at 433, 456). Claimant denied any mood swings and was very excited about a book that he published. (Tr. at 467). Thereafter, Claimant reported an episode of mania and depression in July 2009, but Claimant told Dr. Razavipour that he subsequently felt fine. (Tr. at 468). In August 2009, Claimant resumed therapy. (Tr. at 457). Claimant still expressed symptoms related to bipolar disorder, particularly depression, but was about to publish a book and was planning a trip to Europe to promote it. (*Id.*). Claimant's Tegretol was increased and he was additionally prescribed Celexa and, thus, Claimant stated in September 2009 that he felt much more secure and no longer required therapy. (Tr. at 459).

Claimant continued to see Dr. Razavipour and stated that he felt well until approximately November 2010. (Tr. at 470, 471, 602). In October and November 2010, Claimant again presented to the hospital with suicidal ideation, stating that he was under a great deal of stress from an abusive relationship, recent assault by a houseguest, and ill family members. (Tr. at 658, 662, 666). However, Claimant was discharged with

33

a generally normal mental status. (Tr. at 659). He stated that he was a teacher in Harlem and requested to be continued on Tegretol, which he said worked well for him and kept his longstanding history of bipolar disorder stable. (Tr. at 662). Claimant began seeing Dr. Afroz thereafter in December 2010 and was cooperative on examination with goal-directed thought processes, a good mood, a euthymic affect, normal memory, and fair concentration. (Tr. at 604-05). Thereafter, Claimant again presented to the hospital in February 2011 highly intoxicated with suicidal ideation. (Tr. at 795). Claimant explained to his therapist the next month that he had begun drinking some after a bad visit with an old friend and he "hit another dip in his depression." (Tr. at 830). Nevertheless, after the foregoing incident, Dr. Afroz recorded in March 2011 that Claimant's mental status was within normal limits, his mood was stable, and he was "doing better now." (Tr. at 831-32). At his next visit with Dr. Afroz in June 2011, a few months after Claimant's date last insured, Claimant was still "doing good," his mood was stable, and his mental status was within normal limits. (Tr. at 835-36). Therefore, the record substantially supports the ALJ's assessment that, when properly medicated, Claimant did not have disabling psychological limitations as he alleged.

In addition to the medical evidence, the ALJ properly considered Claimant's statements, his daily activities, and the opinion evidence to evaluate the intensity, persistence, and severity of Claimant's reported symptoms. Therefore, taken as a whole, the undersigned **FINDS** that substantial evidence supports the ALJ's subjective symptom analysis.

### B. Weight of Treating Psychiatrist's Opinion

Claimant further argues that the ALJ failed to provide persuasive evidence as to why Dr. Afroz's May 2012 opinion was entitled to little weight. (ECF No. 6 at 7). When

evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2). Title 20 C.F.R. § 404.1527(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6),[1] and must explain the reasons for the weight given to the opinions. "Adjudicators must

---

[1] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence.[2] *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues

---

[2] Although 20 C.F.R. § 404.1527(c) provides that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* § 404.1527(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In this case, as discussed above, the ALJ considered Dr. Afroz's May 2012 opinion identifying marked and extreme mental symptoms and stating that Claimant would miss at least five days of work per month due to his mental impairments or treatment, but the ALJ determined that the opinion was not entitled to controlling weight. (Tr. at 1000).

Thus, in accordance with the regulation, the ALJ considered the six factors listed in 20 C.F.R. § 404.1527(c). (*Id.*). Regarding the first factor, the length of the treatment relationship, the ALJ noted that Claimant only saw Dr. Afroz once during the relevant period, as Claimant only began seeing Dr. Afroz four months before his date last insured. (*Id.*). As to the second factor, the nature of the relationship, the ALJ considered that Claimant saw Dr. Afroz for counseling sessions and prescriptions refills. (*Id.*). Concerning the third factor, the supportability of Dr. Afroz's opinion, the ALJ stated that Dr. Afroz's opinion was not well supported, but instead merely listed diagnoses and prescription medication, considered of check-marked boxes on a form, and mentioned panic attacks. (*Id.*).

The fourth factor that the ALJ considered was the consistency of Dr. Afroz's opinion with the record as a whole. The ALJ found Dr. Afroz's opinion to be inconsistent with the objective evidence, citing that Claimant's mental problems were stable when he was medically compliant and sober and his mental status examinations were grossly normal overall. (Tr. at 1001). The ALJ noted that in March 2011, three weeks prior to Claimant's date last insured, Dr. Afroz assessed that Claimant's appearance, sociability, speech, thought content, motor activity, recall memory, coping ability, and orientation were within normal limits. (*Id.*). Dr. Afroz noted at that time that Claimant was doing better with a stable mood, good sleep, and no panic attacks. (*Id.*). The ALJ also noted that there was no objective evidence that Claimant would miss more than five days of work on a consistent basis each month due to his impairments or treatment. (*Id.*). Furthermore, the ALJ remarked that Dr. Afroz's assessment that Claimant had only mild and moderate functional limitations did not reconcile with his assessment that Claimant had marked and extreme signs and symptoms of his impairments. (*Id.*). Also, the ALJ

took note of the fact that Dr. Afroz's opinion was issued over a year after Claimant's date last insured and did not account for Claimant's functioning during the relevant period. (*Id.*).

Turning to the fifth factor, which required the ALJ to give more weight to the opinion of a specialist about medical issues related to his or her specialty, the ALJ noted that Dr. Afroz was indeed a psychiatrist. (*Id.*). Therefore, Dr. Afroz was a specialist in the area of mental health that was the subject of his opinion. (*Id.*). Finally, the ALJ considered the sixth factor, which concerned Dr. Afroz's understanding of Social Security disability programs and their evidentiary requirements, as well as his familiarity with the other information in the record. (*Id.*). The ALJ concluded that there was no evidence that Dr. Afroz was familiar with the Social Security disability program and its evidentiary requirements or the other medical evidence in the record when he issued his opinion. (*Id.*).

Overall, the ALJ found that despite Dr. Afroz's specialization in the area of psychiatry, the other factors weighed against giving controlling weight, or even great weight, to Dr. Afroz's opinion. Such considerations included Claimant's minimal treatment relationship with Dr. Afroz during the relevant period, the lack of supportability and internal consistency in Dr. Afroz's opinion, and the other factors noted in the regulation. The ALJ very clearly articulated his consideration of every factor and provided a reasoned, well-supported basis for his determination that Dr. Afroz's opinion was entitled to little weight. The ALJ's conclusions are supported by substantial evidence in the record. For example, Dr. Afroz recorded in March 2011 that Claimant's mental status with within normal limits and his mood was stable. (Tr. at 831-32). Even in June 2011, a few months after Claimant's date last insured, Dr. Afroz noted that

Claimant was still "doing good," his mood was stable, and his mental status was within normal limits. (Tr. at 835-36). Therefore, Dr. Afroz's treatment notes do not reconcile with his opinion that was rendered a year later. In fact, Dr. Afroz's May 2012 opinion indicating marked and extreme signs and symptoms of Claimant's mental impairments does not, in any way, indicate that the opinion relates to Claimant's condition prior to Claimant's date last insured on March 31, 2011. The lack of supportability and above inconsistencies, combined with the minimal treatment relationship prior to Claimant's date last insured and the other noted factors, provided ample justification for the ALJ's decision to ascribe little weight to Dr. Afroz's opinion.

Relating to the above points, Claimant argues that the ALJ unfairly assessed that he had little treatment with Dr. Afroz, although he treated with Dr. Afroz's predecessors since 2007. (ECF No. 6 at 7). Claimant further complains that it was disingenuous for the ALJ to take into account the fact that Dr. Afroz's opinion was rendered after his date last insured because he began treating with Dr. Afroz a few months before his date last insured. However, as mentioned, Dr. Afroz's May 2012 opinion does not demonstrate that it related to the period under review by the ALJ. Furthermore, Dr. Afroz's opinion and treatment notes do not indicate that they are based upon any of Claimant's prior treatment at Prestera Center. Dr. Afroz expressed his opinion as his own assessment based upon his evaluation and treatment of Claimant.

Therefore, the undersigned **FINDS** that the ALJ properly considered and weighed Dr. Afroz's treating source opinion and the ALJ's assessment of the opinion is supported by substantial evidence.

### C. Vocational Expert Testimony

Finally, Claimant challenges the fact that the ALJ did not accept the opinion of

the vocational experts that he could not maintain any competitive employment, if he was off-task 20 percent or more of the work day. (ECF No. 6 at 6, 7). In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into an RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

In this case, the vocational experts at both of Claimant's administrative hearings testified that a person cannot maintain competitive employment if the person is off-task 20 percent or more of the work day. (Tr. at 48, 1138). Claimant indicates that the ALJ should have accepted this testimony and concluded that he was disabled. However,

Claimant does not offer evidence demonstrating that he would be off-task 20 percent or more of the workday. As discussed, Claimant's mental status examinations were grossly normal overall. He wrote and published books and articles and maintained a variety of other daily activities. Even Claimant's mental status examinations by Dr. Afroz just before and shortly after his date last insured did not show any significant issues whatsoever. (Tr. at 831-32, 835-36). While there was evidence that Claimant had some moderate limitations in social functioning and maintaining concentration, persistence, or pace, as the ALJ concluded, the record did not support that Claimant suffered from extreme limitations, symptoms, or impairments to the extent that he would be off-task for one-fifth or more of the workday. Therefore, there was no justification for the ALJ to rely on the vocational experts' responses to the hypothetical questions concerning an individual who is off-task 20 percent or more of the workday. As the ALJ very clearly explained in the decision, such limitation was not supported by the objective medical record. (Tr. at 1003).

Accordingly, the undersigned **FINDS** that the ALJ properly relied on the expert's testimony at steps four and five of the sequential evaluation.

## VIII.   <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 6); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 7); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is

hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  January 14, 2019

Cheryl A. Eifert
United States Magistrate Judge

43